**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | |
| | : | Bankruptcy No. 10-24280-JAD |
| **BEVERLY JEAN DOERNTE,** | : | |
| | : | Chapter 13 |
| Debtor. | : | |
| _____ | X | |
| | : | |
| **BEVERLY JEAN DOERNTE,** | : | Adversary No. 15-2080-JAD |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| **EDUCATIONAL CREDIT** | : | |
| **MANAGEMENT CORPORATION.** | : | |
| | : | |
| Defendant. | : | |
| _____ | X | |

## <u>MEMORANDUM OPINION</u>

The matter before the Court is a complaint to determine dischargeability of an educational loan debt filed by Beverly Jean Doernte (the "Debtor"). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

This *Memorandum Opinion* constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. For the reasons set forth below, judgment will be entered in favor of Defendant Educational Credit Management Corporation ("ECMC") and against the Debtor, finding that the Debtor's educational loan debt is non-dischargeable pursuant to 11 U.S.C. § 523(a)(8).

## I.
## <u>The Student Loan Exception to Discharge</u>

In the United States, a general rule of law is that contractual commitments are to be honored.  Bankruptcy is an exception to this general rule because certain debts are discharged in bankruptcy for the honest but unfortunate debtor. <u>Local Loan Co. v. Hunt</u>, 292 U.S. 234, 244 (1934).

One of the fundamental purposes of our bankruptcy laws is to provide a debtor with a financial fresh start in life.  <u>United States Dep't of Health & Human Svs. v. Smith</u>, 807 F.2d 122, 123-24 (8th Cir. 1986)(citing <u>Kokoska v. Belford</u>, 417 U.S. 642, 645-46 (1974)).  As the United States Supreme Court explained: "[bankruptcy] gives the honest but unfortunate debtor . . . a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." <u>Local Loan</u>, 292 U.S. at 244.  As such, the effect of a bankruptcy discharge operates to permanently release an individual debtor from pre-petition *in personam* obligations. <u>See</u> 11 U.S.C. §§ 727(b) and 1328(a).

Notwithstanding this general precept, Congress has decided that the bankruptcy discharge is not absolute, and that certain types of debts should remain payable and not be discharged at the conclusion of a bankruptcy case. One such exception to the general application of the bankruptcy discharge arises in the context of debts for educational loans.  Specifically, § 523(a)(8) of the Bankruptcy Code does not permit an individual debtor to be discharged from any debt for educational loans "unless excepting such debt from

2

discharge . . . would impose an undue hardship on the debtor and the debtor's

dependents." <u>See</u> 11 U.S.C. § 523(a)(8).

As to the motivation of Congress to treat educational loan debts in

bankruptcy differently from other garden variety unsecured debts, one

commentator succinctly described the purposes behind the student loan

exception to discharge as follows:

> Prior to 1977, there was no provision in the bankruptcy laws regarding the dischargeability of educational loans. Section 523(a)(8) was enacted with the promulgation of the Bankruptcy Code in 1978 in response to the perception that a growing tide of students were abusing the bankruptcy laws by discharging large amounts of educational indebtedness shortly after leaving school, despite having well-paying jobs and few other debts.  To the extent that a failure to repay student loans would have an adverse impact upon funds available for future generations of students, it was thought that the national interest in providing educational assistance through student loan programs would be seriously undermined [if such debts were generally dischargeable in bankruptcy]. Thus, safeguarding the integrity of the student loan programs while curtailing the ability of student borrowers to unfairly exploit its benefits were the twin objectives of the legislation.

George H. Singer, <u>Section 523 of the Bankruptcy Code: The Fundamentals of</u>

<u>Nondischargeability in Consumer Bankruptcy</u>, 71 Am. Bankr. L.J. 325, 387

(1997)(citations omitted); <u>see also</u> <u>In re Pelkowski</u>, 990 F.2d 737, 742-743 (3d

Cir. 1993)(describing the legislative history behind the educational loan

exception to discharge).

Stated in other words:

> In enacting the undue hardship standard, Congress had to take into account the viability of the student loan program. That

> program serves valuable purposes. It affords individuals in all
> walks of life the opportunity to obtain an education, and with it the
> mobility and financial stability that an education can provide.
> Indeed, without the program, many people would never receive any
> higher education, because their credit risks would preclude them
> from obtaining private commercial loans.

In re Frushour, 433 F.3d 393, 399 (4th Cir. 2005) (citation omitted); see also In re Brunner, 46 B.R. 752, 756 (S.D.N.Y. 1985) ("In return for giving aid to individuals who represent poor credit risks, it strips these individuals of the refuge of bankruptcy in all but extreme circumstances."), aff'd, 831 F.2d 395 (2d Cir. 1987).

## II.
### Standard for Evaluating Whether Student Loan Debt is Dischargeable

Under § 523(a)(8) of the Bankruptcy Code, debts for educational loans are non-dischargeable unless it can be demonstrated that repayment of the debts present an "undue hardship" to the debtor and the debtor's dependents. The Bankruptcy Code, however, does not define the term "undue hardship." This omission has required courts to establish the parameters for determining what constitutes an "undue hardship."

The United States Court of Appeals for the Third Circuit adopted the test for "undue hardship" as outlined in the case of Brunner v. New York Higher Education Services Corp., 831 F.2d 395 (2d Cir. 1987). See Pa. Higher Educ. Assistance Agency v. Faish (In re Faish), 72 F.3d 298, 306 (3d Cir. 1995) cert. denied, 518 U.S. 1009 (1996); see also Lepre v. United States Department of Education, et al., 530 Fed. Appx. 121 (3d Cir. 2013), cert. denied, 134 S.Ct. 525 (2013).

Under the <u>Brunner</u> test, debts on account of an educational loan are not dischargeable unless it is proven that:

(1) based on current income and expenses, the debtor cannot maintain a minimal standard of living for herself and her dependents if she has to repay the loan;

(2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the loan repayment period; and

(3) the debtor has made a good faith effort to repay the loan.

<u>Lepre</u>, 530 Fed. Appx. at 123 (citing <u>Faish</u>, 72 F.3d at 304-05).

In terms of application of these standards, the Debtor bears the burden of proof (by a preponderance of the evidence) as to each prong of this test. <u>Brightful v. Pa. Higher Educ. Assistance Agency (In re Brightful)</u>, 267 F.3d 324, 327 (3d Cir. 2001) (citing <u>Faish</u>, 72 F.3d at 306; <u>Grogan v. Garner</u>, 498 U.S. 279, 291, 112 L. Ed. 2d 755, 111 S. Ct. 654 (1991)).

In addition, each of the three prongs must be satisfied individually before a discharge of the obligation at issue can be granted.  <u>Faish</u>, 72 F.3d at 306. Thus, if any one prong is not satisfied, that will end the Court's inquiry without the entry of a discharge of the educational debt. <u>Id.</u>  Moreover, the Third Circuit has instructed that, while considering each prong, the Court may not consider any extraneous factors outside of the <u>Brunner</u> framework, including equitable concerns.  <u>See</u> <u>In re Lepre</u>, 530 Fed. Appx. at 123.  It is within this framework that the Court evaluates the Debtor's request for a hardship discharge.

### III.
### Procedural History

The Debtor filed her chapter 13 case on June 13, 2010, and contemporaneously filed her *Chapter 13 Plan*, which was amended on July 25, 2010. The Court approved her *Amended Chapter 13 Plan* by order dated September 13, 2010. The record reflects that the Debtor's *Amended Chapter 13 Plan* was a five-year plan; and on April 12, 2016, the Chapter 13 Trustee's *Final Report & Account*, indicating that all plan payments were made, was approved by this Court.

Almost five years after filing her Petition, and contemplating the entry of her discharge, the Debtor filed her *Complaint*, wherein she asks the Court to rule that she is discharged from having to repay her consolidated student loans.[1] Thereafter an *Answer* was filed by ECMC and the parties conducted discovery.

On October 19, 2016, this Court conducted a trial. The only witnesses called to testify at the trial were the Debtor and her spouse. Various documents were also admitted into evidence, along with a deposition transcript of the Debtor's family physician—Dr. Walter Michael Fetchero—which was

---

[1] In the chapter 13 context, some courts have questioned whether an undue hardship complaint is "ripe" if filed during the early stages of a chapter 13 bankruptcy case. Because the length of a confirmed chapter 13 plan is three to five years in duration, and given the uncertainty as to whether the debtor will complete the plan, various courts have concluded that an undue hardship complaint is not ripe when filed early in a chapter 13 case given the large temporal gap between the date of filing of the complaint and discharge. See Susan E. Hauser and Daniel A. Austin, Graduating With Debt: Student Loans Under the Bankruptcy Code at pp. 84-87 (American Bankruptcy Institute 2016); see In re Cassim, 594 F.3d 432, 441 (6th Cir. 2009) ("Factual circumstances regarding the elements necessary to establish hardship under § 523(a)(8) may also counsel against making an undue hardship determination significantly before the debtor's discharge under § 1328."); accord, Bender v. Educational Credit Management Corporation (In re Bender), 368 F.3d 846 (8th Cir. 2004).

offered into evidence by the Debtor without objection.  <u>See</u> Fetchero Depo. Tr., Ex. P-43.  ECMC also offered an Affidavit of Jennifer Skerbinc that was also admitted into evidence without objection.  <u>See</u> Defendant Trial Ex. D-8. Following the trial, extensive briefing was done by the parties.  When the briefing was completed on April 18, 2017, the Court took the matter under advisement.

**IV.**
<u>**Trial Evidence Relating to the Debtor's Student Loan Debt and
Her Education and Current Employment Status**</u>

Based upon the review of the record, it appears that many of the facts of this case are not in dispute.  Neither party contests that the debt at issue constitutes an educational loan debt as described under 11 U.S.C. § 523(a)(8). The parties also do not dispute that the majority of the educational loan debt in question was incurred while the Debtor attended various post-secondary educational programs from 1987 through 2003.

Chronologically, after taking a few college courses over the previous years, the Debtor ultimately obtained a secretarial diploma from the Sawyer School of Business in 1992.  Thereafter, the Debtor obtained an Associate's Degree from Westmoreland Community College in 1994.  In 1999, the Debtor received a Bachelor's Degree from Robert Morris University.  In 2003, the Debtor obtained a Master's of Science Degree in Computer Information Systems from University of Phoenix. Thereafter, Plaintiff again attended Westmoreland County Community College between 2004 and 2009, seeking to obtain a certificate in Computer Information Security.  The Debtor testified that

7

she obtained the loans at issue for her post-secondary education at the "community college . . . Robert Morris . . . and . . . Phoenix." See Trial Tr. 19:1-10; Trial Tr. 54:3-6.

The trial record also reflects that on October 16, 2003, and within several months of completing her master's degree, the Debtor consolidated her educational loan debt. See Trial Tr. at 54:20-23; Tr. Ex. D-5. Prior to the consolidation, the Debtor had made some payments before participating in the master's program, and she also received loan deferments. See Trial Tr. 19:11-17.

After receiving her master's degree in 2003, the Debtor was employed in a variety of jobs which compensated her at rates ranging from $47,000 in 2003, to a current salary of $63,000. See Trial Tr. 55:1-20.  In addition to her current salary of $63,000, the debtor receives benefits, including medical insurance for her and her spouse. See, e.g., Trial Tr. 11:3-17; 97:4-5; see also Debtor's Post-Trial Brief 16, AP-ECF No. 71.  The Debtor also acknowledged at trial that without her education she would not likely have her current position and that she derived a "significant benefit from the education in terms of her employment." See Trial Tr. 57:2-9.

In her Post-Trial Brief, the Debtor states that she is "seeking to discharge $126,994.13 of debt incurred as the result of a 2003 student loan consolidation" (hereafter "Consolidated Student Loan"). See Plaintiff's Post-Trial Brief 1, AP-ECF No. 71.  ECMC's Answer avers that as of April 15, 2015, the

8

principal balance due from the Debtor on account of the Consolidated Student Loan is $96,463.15. See *Answer* 1, AP-ECF No. 9.

Following the consolidation, the Debtor received various deferments and grants of forbearance such that the she did not make any payments on account of the Consolidated Student Loan prior to the filing of her chapter 13 case in 2010. See Defendant Trial Exhibits D-2, D-4, and D-8. Accordingly, her Consolidated Student Loan was not in default status when she filed her bankruptcy case. Since the consolidation in 2003, only one payment has been made on the Consolidated Student Loan. That payment was made during the pendency of this chapter 13 case and was disbursed by the Chapter 13 Trustee in the amount of $358.38. (Trial Tr. 28:16-25.)

**V.**
**The Brunner Test in Light of the Debtor's Circumstances**

**A.**
**Legal Test for Determining Whether the Debtor Can**
**Pay the Student Loans and Maintain a Minimal Standard of Living**

During the trial, evidence was presented as to each of the three prongs of the Brunner test. To meet the first prong under Brunner, the Debtor must demonstrate, based on current income and expenses, that she could not afford to "maintain a minimal standard of living" if forced to repay her student loans. With respect to evaluating this claim, this Court observes that a minimal standard of living:

> is not a fixed measure, and the concept is not defined by bright lines. The upper limits of a minimal standard of living generally allow for a debtor to purchase "the basic necessities, such as food, clothing, housing and medical treatment." While it does not

9

relegate a debtor to the depths of "abject poverty, a minimal standard of living does not accommodate 'luxury type expenses.'" After providing for his or her basic needs, a debtor may not use her . . . financial resources for discretionary expenditures in lieu of repaying student loan creditors.

In re Crawley, 460 B.R. 421, 436 (Bankr. E.D. Pa. 2011) (citing In re Miller, 409 B.R. 299, 311 (Bankr. E.D. Pa. 2009) (quoting In re Johnson, 400 B.R. 167, 173 (Bankr. M.D. Pa. 2009)).

In ascertaining whether the Debtor can both repay the educational loans at issue and maintain a "minimal standard of living," case law provides that the current income and expenses of the Debtor are to be evaluated by the Court and such items are analyzed and measured at the time of the filing of the complaint. See Walker v. Sallie Mae Servicing Corp. (In re Walker), 650 F.3d 1227 (8th Cir. 2011);[2] see also Watkins v. Educ. Credit Mgmt. Corp. (In re Watkins), 461 B.R. 57, 59-61 (W.D. Mo. 2011).

It has also been held that the first prong of the Brunner test requires "more than a showing of tight finances" and that the first prong will not be satisfied if the Debtor could pay the loans by engaging in some "short-term, belt tightening." Faish, 72 F.3d at 306. Nevertheless, as set forth above, "this standard does not require that a debtor must be forced to live in poverty." In re Flickinger-Luther, 462 B.R. 157, 161 (Bankr. W.D. Pa. 2012) (citing Alston v.

---

[2] The Court recognizes that the 8th Circuit is a "totality of the circumstances" jurisdiction for determining "undue hardship" and the Third Circuit is not. See Faish, supra. Notwithstanding this difference, this Court agrees that the debtor's circumstances at the time a section 523(a)(8) complaint is filed governs the analysis for the first prong of the Brunner analysis. Nothing contained on this *Memorandum Opinion* should be construed as adopting any portion of the opinion in Walker that is contrary to Faish.

United States Dep't of Educ. (In re Alston), 297 B.R. 410, 415 (Bankr. E.D. Pa. 2003)).

Acknowledging an absence of a bright-line test, Chief U.S. Bankruptcy Judge Eric Frank of the United States Bankruptcy Court for the Eastern District of Pennsylvania summarized the analysis regarding "a minimal standard of living" as being "somewhere between poverty and mere difficulty." In re Miller, 409 B.R. at 311 (quoting In re McLaney, 314 B.R. 228, 234 (Bankr. M.D. Ala. 2004), aff'd as modified, 375 B.R. 666 (M.D. Ala. 2007)).  In assessing the contours of a minimal standard of living, Chief Judge Frank in the Miller case also found helpful the list of basic needs set forth in the case of  In re Ivory, 269 B.R. 890 (Bankr. N.D. Ala. 2001). See In re Miller, 409 B.R. at 311-312.

As to the debtor and the debtor's dependents, the decision in Ivory identified elements of a "minimal standard of living" as including the following:

(1)     shelter that is furnished, clean, free of pests and climate-regulated with heating and cooling;

(2)     basic utilities such as electricity, water, gas and telephone;

(3)     food and personal hygiene products;

(4)     transportation or vehicles (and the ability to service and insure those vehicles);

(5)     life insurance and health insurance (or the ability to pay for medical and dental expenses); and

(6)     modest recreation.

Id. (citing In re Ivory, 269 B.R. at 899).

Thus, in evaluating whether the Debtor *sub judice* has satisfied the first prong of the <u>Brunner</u> test, the Court must consider the Debtor's income and the expected cost of providing for the above enumerated basic needs for the Debtor and any of her dependents, and then evaluate whether the Debtor has any additional funds available to make the necessary payments towards her Consolidated Student Loan. <u>In re Jones</u>, 392 B.R. 116, 127 (Bankr. E.D. Pa. 2008); <u>see also</u> <u>In re Burton</u>, 339 B.R. 856, 870-71 (Bankr. E.D. Va. 2006) (once the court determines the amount minimally necessary to ensure that the debtor's needs for food, shelter, clothing, and medical treatment are met, "the question is whether the debtor has additional funds with which to make payments toward . . . [the] student loans").

**B.**
**Income and Expenses of the Debtor**
**Reflect that She Can Maintain a Minimal**
**Standard of Living and Pay the Student Loans**

The preponderance of the evidence adduced at trial is that the Debtor can maintain a minimal standard of living, and yet have sufficient funds left over every month to make payment on account of her student loans.  As a result, the Debtor has failed to prove the first element of the <u>Brunner</u> test and judgment should be entered in favor of ECMC.

The facts reveal that the Debtor is currently 47 years of age, is married, and is gainfully employed as the data base administrator at the Carnegie Library of Pittsburgh.  The record reflects that she has been at her position at least five years, her current gross salary is approximately $63,000 per year,

and that she expects to receive annual raises of approximately 3% of her salary per year.

In addition to the general recitation of her current gross salary, the specifics of her income and expenses are generally not in dispute, except that some of the expenses articulated by the Debtor at trial are disputed by ECMC as being unnecessary for the Debtor to maintain a minimal standard of living for purposes of the first prong of the Brunner test.

A recitation or summary of the amount of income and expenses generally asserted by the Debtor at trial is set forth in the Debtor's *Post-Trial Brief*. See ECF No. 71, at 15-16.  The Court would note that some of the numbers summarized by the Debtor in her *Post-Trial Brief* are set forth in bi-weekly amounts because the Debtor receives her paycheck from the Carnegie Library of Pittsburgh on a bi-weekly basis.  In order to have an appropriate comparison of the Debtor's monthly income versus her monthly expenses, the Court has converted the bi-weekly amounts into monthly amounts by taking the bi-weekly sums and multiplying them by 26 (which is the number of bi-weeks in a year) and then dividing these sums by 12 (the number of months in a year).  As set forth on page 15 of the Debtor's *Post-Trial Brief*, the Debtor acknowledges this form of calculation.[3]

The evidence shows that the Debtor's monthly gross income at the time of trial was $5,242.99, which is based on an actual annual salary of

---

[3] Numbers have been rounded to the nearest penny.

$62,915.88.    Excluding   the   Debtor's   retirement   account   contributions pursuant  to  a  "403(b)  Plan,"  which  will  be  addressed  below,  the  evidence adduced at trial reveals the following expenses are taken from her gross pay by her employer (the "Employer Withholdings"):

| Description | Amount |
|---|---|
| Federal Income Tax | $ 689.09 |
| Pennsylvania Income Tax | $ 143.50 |
| Local Service Tax | $    4.33 |
| Jeannette City Tax | $   86.47 |
| Pa Unemployment Tax | $    3.68 |
| Medicare Tax | $   67.02 |
| Social Security Tax | $ 286.56 |
| Dental | $   52.22 |
| Medical Insurance | $ 275.23 |
| Health Savings Account | $ 230.21 |
| Vision | $   10.96 |
| Parking | $   58.76 |
| TOTAL: | $1,908.03 |

When  the  Court  subtracts  Employer  Withholdings  from  the  Debtor's gross pay, it results in a preliminary income calculation of $3,334.96 for the Debtor.  This sum, however, is subject to an upward adjustment due to the fact that  the  Debtor  overpays  her  Federal  income  taxes.    The  overpayment  is reflected by the tax returns the Debtor filed for the tax years of 2013 (which

had a tax refund of $2,141), 2014 (which had a tax refund of $2,192) and 2015 (which had a tax refund of $2,307). See *Plaintiff's Exhibit 37.*[4]

The evidence therefore reflects that for the three year period prior to trial, the Debtor's average Federal tax refund was $2,213.33.   Spreading this sum over a twelve month time period yields an upward adjustment of the Debtor's preliminary income by the amount of $184.44. See Gharavi v. U.S. Dept. of Educ. (In re Gharavi), 335 B.R. 492 (Bankr. D. Mass. 2006)(where the court used the average tax refund for the previous three years in calculating the debtor's income).

As a result, the real monthly income of the Debtor after deduction of the Employer Withholdings set forth above is $3,519.40.  This amount significantly exceeds the lowest income contingent repayment plan offered by the Defendant, which is the Revised Pay As You Earn Plan (or "REPAYE") and is $311.86 per month.[5]   This real monthly income amount is also more than enough to meet the Debtor's basic needs, as set forth in the numbers propounded by the Debtor at trial (and as set forth on page 16 of her *Post-Trial Brief)*.  This comparison is summarized below:

---

[4] In figuring the amount of monthly income a debtor has available for purposes of paying a student loan, courts have factored anticipated tax refunds into the calculations. See, e.g., McNemar v. Student Loan Servicing Center (In re McNemar), 352 B.R. 621 (Bankr. N.D. Va. 2006).

[5] The Debtor's financial situation, as described more fully in this *Memorandum Opinion*, is such that she has additional disposable income to make monthly payments to ECMC under some of the other income contingent repayment plans (including those plans that may have a monthly payment higher than the $311.86 payment due pursuant the REPAYE plan).  An example would be the Income-Based Repayment Plan or "IBR" that has a monthly payment of $487.79. See Trial Exhibit D-8, Ex. D.  For simplicity sake, however, the Court utilizes the REPAYE figures as they are the most affordable to the Debtor.

| | |
|---|---|
| Real Monthly Income after the Employer Withholding | $3,519.40 |
| Less Expenses for Maintaining Minimal Standard of Living | ($2,834.12) |
| Funds Available for Student Loan | $685.28 |
| Less REPAYE | ($311.86) |
| Excess Income Above Student Loan Payment | $373.42 |

To be more specific, for purposes of this *Memorandum Opinion*, the Court has accepted in the above calculation certain expenses enumerated by the Debtor in her *Post-Trial Brief*. The expenses the Court accepted are consistent with the types of expenses necessary for a minimal standard of living as described in <u>Ivory</u>, <u>supra</u>. Those expenses include expenses for: shelter, utilities, healthcare, health insurance, food, hygiene, transportation, and modest recreation. The expenses the Court has accepted are as follows:

| | |
|---|---|
| Mortgage and Property Taxes | ($705.00) |
| Transportation | ($500.00) |
| Medications/Doctors Visits | ($216.00) |
| Telephone | ($ 69.00) |
| Internet | ($ 77.00) |
| Garbage | ($ 13.33) |
| Water | ($ 20.72) |
| Sewage | ($ 57.00) |
| Gas | ($102.00) |
| Electricity | ($ 86.00) |
| Food / Housekeeping | ($370.00) |
| X-Box | ($ 14.99) |
| X-Box Live | ($ 4.16) |
| Insurance (life and homeowners) | ($147.00) |
| Clothing, Laundry, Dry Cleaning | ($ 25.00) |
| Pet Care | ($150.00) |
| Per Capita Tax | ($  2.00) |
| Personal Care Products Services | ($ 60.00) |
| Amazon Prime | ($  9.92) |
| Maintenance (home) | ($205.00) |

_____
Total:                                                              ($2,834.12)

The Court does recognize that some of these expenses can be second guessed. For example, the X-Box and Amazon Prime expenses are not necessarily required for the maintenance of the Debtor or her husband. But, the amounts are modest; and, as set forth above, modest recreation is consistent with a minimal standard of living.

In addition, the Debtor testified that she has constant maintenance issues with her home. But, according to ECMC, she has refused to "belt tighten" and surrender the home in her chapter 13 and otherwise find an apartment that would not have the maintenance expense set forth in her budget. Regardless, given her excess funds, the Court finds it unnecessary to second guess this lifestyle choice of the Debtor.

The sum for pet care is also questioned by ECMC. It argues that a pet is a luxury item and that the Debtor is choosing to own pets at the expense of her creditors. However, the Court finds that the expenses are reasonable and that the Debtor's pets are part of the fabric of her family and social life. As such, the pet care expense appears to be necessary for the Debtor to maintain a minimal standard of living.

ECMC also questions the Debtor's internet expenses. It is true that some cases suggest that the sums budgeted for internet usage should not be included in the computation of a minimal standard of living. See, e.g., Educ.

Credit Mgt. Corp. v. Mosko (In re Mosko), 515 F.2d 319, 325 (4th Cir.

2008)(where the Fourth Circuit affirmed the finding that "$75 for internet, $80

for cell phones, $60 for satellite television, $68 for a YMCA membership, and

an undisclosed amount for cigarettes" to be "unnecessary to maintain a

minimum standard of living").   However, the record reflects that the Debtor

teleworks at least one day per week and internet usage is necessary for her to

do so.

## C.
### Debtor's Retirement Contributions, Payments to Her
### Non-Resident Spouse, and Desire to Purchase
### a New Car Does Not Change the Outcome

Notwithstanding the excess income that the Court calculates, the Debtor

still contends that her financial condition is precarious, and that she lacks

sufficient income to both maintain a minimal standard of living and make her

student loan payments.   In support of her position, Debtor makes a number of

additional budgetary contentions.   These contentions relate to the Debtor's

voluntary retirement plan contributions and the Debtor's efforts to contribute

funds to, and for the benefit of, her husband.   They also relate to her desire to

purchase a new car.

As to the retirement account, the Debtor notes that her payroll

deductions include a deduction on account of a "403(b) Plan."   The Debtor

contends that this 403(b) Plan contribution should be included as part of the

current expenses that are necessary for the Debtor to maintain her minimal

standard of living.   The record reflects that the bi-weekly contribution amounts

to $120.99 per pay check, which translates to a contribution of $262.15 per month.  Of course, as set forth above, the Debtor's own admissions as reflected in her *Post-Trial Brief* provide that the Debtor has more than enough disposable income to continue to contribute to her 403(b) Plan without affecting her ability to make payment to ECMC (pursuant to the REPAYE income contingent repayment plan).

Some courts have concluded that there is "no *per se* rule that voluntary contributions to retirement plans are never a reasonably necessary expense." See e.g., Craig v. Educ. Credit Mgmt. Corp. (In re Craig), 579 F.3d 1040, 1046 (9th Cir. 2009); In re Allen, 329 B.R. 544, 551-52 (Bankr. W.D. Pa. 2005). However, if that is the rule, the Court is not convinced that the circumstances in this case are such that the amount of the Debtor's contributions to her 403(b) Plan should be included in the determination of the Debtor's "minimal standard of living" for purposes of the Brunner test.  The Court reaches this conclusion for a number of reasons.

First, as set forth above, the Debtor has more than enough disposable income to make voluntary contributions to her 403(b) Plan.  Even if she did not, the record reflects that the Debtor is now 47 years of age and expects to receive an annual 3% raise in her income every year, which means that starting in 2017 the Debtor would have an additional $1,890 per year (or $157.50 per month) to contribute towards her retirement plan.  In year 2018 and thereafter, the Debtor should have even more funds to contribute to her

19

retirement, all the while her employer continues to make matching contributions to her 403(b) Plan.[6]

Second, during the pendency of her bankruptcy case the Debtor has been accumulating assets in the form of making contributions to her 403(b) Plan. Her schedules also reflect that the Debtor has exempted at least $28,228.87 in various assets in this case, including $19,773.68 of retirement assets. See Schedule C 13-14, ECF No. 1. During the trial of this matter, the Debtor admitted that such sums had grown to "$40,000 to $50,000." See Trial Tr. 46:3-6. In addition, since the Debtor avoided the second mortgage on her home during the pendency of this bankruptcy case, and since the Debtor has reduced the amount of the first mortgage on her home from $83,162.72 to $37,391.61, it appears that the Debtor has in excess of $40,000 in equity in her residence. See Schedules A and D, ECF No. 1 and Chapter 13 Trustee's Final Report 2 & 4, ECF No. 125 (reflecting the paydown of the principal balance of the Debtor's mortgage). These assets, having a combined worth of approximately $90,000, are germane to the "minimal standard of living" analysis because:

---

[6] The Court is mindful that the Debtor and her treating physician have concerns that her health condition (which includes herniated discs, obesity, anxiety, depression, and other disorders) could impact the Debtor's future employment status. However, the first prong of the Brunner standard concerns the Debtor's current financial status, and not future speculation. In addition, the Debtor's treating physician, Dr. Walter Michael Fetchero, has testified that he is aware of the Debtor's health condition and has indicated that none of the Debtor's health issues currently prevent her from working. See Deposition Transcript of Walter Michael Fetchero, 57:24. In addition, Doctor Fetchero has testified that the Debtor has suffered from one or more of these conditions since 2006 and she has continued to be gainfully employed. Id. 6:11. It also appears that the Debtor's medical difficulties are somewhat mitigated by the fact that her current employment position affords her the flexibility she needs to accommodate her medical conditions. An example in this regard is that her employer permits her to telework from home from time to time.

[A] debtor, even though having very little income, may still be found to have the ability to repay their student loan when it is shown that the debtor has, or will likely have, access to significant assets which could be utilized to repay the loan...

To hold otherwise, and allow a debtor with significant assets to escape their student loan obligations, would undercut the inherent nature of an "undue hardship" inquiry. Ensuring that debtors with the means to repay their student loans do so.

Cekec-Torres v. Access Group, Inc. (In re Cekic-Torres), 431 B.R. 785, 790-91 (Bankr. N.D. Ohio 2010)(internal citations omitted); accord Marcotte v. Brazos Higher Educ. Svs. Corp. (In re Marcotte), 455 B.R. 460, 469 (Bankr. S.C. 2011).

Accordingly, the Court concludes that the Debtor cannot gerrymander her budget in favor of 403(b) Plan contributions to the detriment of her student loan creditor. See, e.g., In re Anes, 195 F.3d 177, 180–81 (3d Cir. 1999);[7] In re Woody, 494 F.3d 939, 952 (10th Cir. 2007); In re Perkins, 318 B.R. 300, 306–07 (Bankr. M.D.N.C. 2004).[8]

The Debtor further contends that the net surplus in her earnings is eroded by the monthly contribution she makes to, and for the benefit of, her husband in the amount of approximately $150 per month. By way of background, the Debtor is married to Mr. Scott Doernte but Mr. Doernte does

---

[7] The Third Circuit has not addressed whether the "disposable income" analysis in Anes has been overruled as a result of the 2005 amendments to Section 1325 of the Bankruptcy Code. To the extent it has, at least one court addressing the issue permitted voluntary contributions to a 401(k) retirement plan in the amount of 3 percent of gross income. See In re Miner, 2017 WL 1011419, *6, *10 (Bankr. W.D. La. 2017). Three percent of the Debtor's monthly gross income is $157.50 ((3% x $63,000)/(12)). If this figure is added to the expense items in calculating the Debtor's "minimal standard of living" under Brunner, the Debtor has enough funds under the facts of this case to make payment on account of her student loans.

[8] The Court also notes that between 2010 and 2016, the Debtor increased her monthly voluntary contributions into her retirement account by $151.94, and into her health savings account by $188.54, for a total monthly increase in savings by the Debtor of $340.38.

not live with the Debtor.  Rather, it is contended that Mr. Doernte lives rent

free in an apartment owned by his parents because Mr. Doernte suffers from

spina bifida and the Debtor refuses to live in a different home that has less

stairs which would be conducive to Mr. Doernte's condition.

> As to the law in this area:

> A majority of courts have determined that it is proper to
> consider the economics of the debtor and the debtor's spouse, as a
> family unit, when determining ability to pay.  See White v. United
> States Dep't of Educ. (In re White), 243 B.R. 498, 509 n. 9 (Bankr.
> N.D. Ala. 1999) (collecting cases); Gill v. Nelnet Loan Servs. (In re
> Gill), 326 B.R. 611, 626 (Bankr. E.D. Va. 2005) ("Courts … have
> held that family income must be the measure of the income
> calculation commanded by the first Brunner prong.").

Murphy v. CEO/Manager, Sallie Mae (In re Murphy), 305 B.R. 780, 795

(Bankr. E.D. Va. 2004); see also Educ. Credit Mgmt. Corp. v. Waterhouse, 333

B.R. 103, 109 (W.D.N.C. 2005); In re Miller, 409 B.R. at 313-314.

When the Court considers Mr. Doernte's residential and financial

condition, this Court is unpersuaded by the Debtor's argument that her

monthly contribution to Mr. Doernte is reasonably necessary for the Debtor

and Mr. Doernte to maintain a minimal standard of living.  The Court reaches

this conclusion because, as set forth above the Debtor has a current monthly

surplus of earnings and such surplus is expected to increase yearly.   In

addition, Mr. Doernte's financial status is that he too has a surplus of income

over expenses.  Specifically, the evidence adduced at trial reflects the following:

| | |
|---|---|
| Monthly Social Security Disability Paid to Mr. Scott Doernte | $1,421.00 |
| Monthly Expenses of Mr. Scott Doernte | ($1,094.37)[9] |
| Net Income: | $326.63 |

As such, the Debtor's unique living arrangement with her husband does not change the Court's conclusion that the Debtor (and her husband) can maintain a minimal standard of living and at the same time pay her student loans.[10]

Finally, for sake of completeness, the Debtor suggests that she has no disposable income for purposes of the <u>Brunner</u> test because her automobile is getting older. She also avers that her automobile is in need of maintenance, and that she will need a new car in the future. The Court finds this argument to be unavailing because transportation costs are already included in her budget. In addition, given the anticipated 3% raises the Debtor will receive in the future, her income position is improving thus further enabling her to

---

[9] The Debtor provides medical, dental, and vision insurance to Mr. Doernte, which is part of her Employer Withholdings. Mr. Doernte pays no rent or utilities where he lives as they are provided by his parents. The evidence adduced at trial is that Mr. Doernte pays the following monthly expenses: transportation ($265), entertainment such as Netflix ($108), cell phone ($86.80), internet ($97.07), food and housekeeping ($265), clothing ($25), other personal care ($7.50), and medical and dental expenses ($240). <u>See</u> Trial Tr. 88, 93, 100, and 105.

[10] While the Court recognizes a spouse's obligation to support the other, such support is based on "their respective abilities to provide support." 23 Pa. C.S.A. §4321. Arguably, Mr. Doernte has a reciprocal obligation to support the Debtor. Relying on information adduced at trial, it appears that Mr. Doernte does not require the financial contributions made by the Debtor to maintain his current standard of living. This conclusion is further supported by the fact that the schedules filed by the Debtor in this case omit any support payments or obligation in favor of Mr. Doernte. <u>See</u> *Schedule* J, at lines 14 and 15; Bankruptcy ECF No. 1. In addition, the tax returns filed by the parties do not mention Mr. Doernte's dependent status. <u>See</u> Trial Ex. P-37 and Trial Ex. P-38.

purchase a new car.  In fact, the record is such that she has already saved in excess of $1,200 towards a new car (and continues to save for it at the rate of $150 per month).  See Trial Tr. 49.  These sums are in addition to the thousands of dollars she has contributed to her 403(b) Plan during the pendency of this bankruptcy case.

The Court finds similarities in the Debtor's case with the Faish case decided by the Third Circuit Court of Appeals.  As the Third Circuit observed in Faish, "full nondischargeability is especially appropriate here because, in essence, Faish was asking the bankruptcy court to allow a discharge of her student-loan obligation so that she could devote the money (which could otherwise have been earmarked for student-loan payments) to savings for the purchase of a new car. . . " In re Faish, 72 F.3d at 307.

The record in this case is that the Debtor has sufficient disposable income to provide for transportation needs and other items necessary to maintain a minimal standard of living.  The record also reflects that the Debtor's gross income, which is more than five times the national poverty guidelines,[11] is sufficient for the Debtor to pay her student loans and to provide for a minimal standard of living for herself and her husband.

These facts therefore lead the Court to conclude that the Debtor failed to meet her burden as to the first prong of the Brunner undue hardship test.  Because the Debtor failed to satisfy the first prong, her failure obviates the

---

[11] The Federal poverty levels can be found at https://aspe.hhs.gov/poverty-guidelines.

need for the Court to analyze the remaining two factors of <u>Brunner</u>.   <u>See</u>
<u>Fabrizio v. U.S. Dep't of Educ. Borrower Servs. Dep't Direct Loans (In re</u>
<u>Fabrizio)</u>, 369 B.R. 238, 244 (Bankr. W.D. Pa. 2007) ("Because the test is
written in the conjunctive, if one of the three elements of the test is not proven,
the inquiry ends there and the student loan cannot be discharged.") (citing <u>In</u>
<u>re Faish</u>, 72 F.3d 298 (3d Cir. 1995); <u>In re Brightful</u>, 267 F.3d 324 (3d Cir.
2001)).   It also mandates that judgment be entered in favor of ECMC, finding
that the Debtor's student loan debt is non-dischargeable.

## V.
## <u>Conclusion</u>

In rendering this *Memorandum Opinion*, the Court has empathy as to the
Debtor's family and health issues.   But the Court is constrained to apply
binding precedent to the facts at bar.   For the reasons set forth above,
judgment must be entered in favor of Defendant ECMC and against the Debtor
finding that the student loan debt at issue is nondischargeable.   An order
consistent with this *Memorandum Opinion* shall be issued by the Court.

**Date:** May 25, 2017                        /s/ Jeffery A. Deller
                                 **JEFFERY A. DELLER**
                                 Chief U.S. Bankruptcy Judge

**CASE ADMINISTRATOR TO MAIL TO:**
    David A. Colecchia, Esq.
    John P. Neblett, Esq.
    Chapter 13 Trustee

FILED
5/25/17 12:06 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA